NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0785n.06
Filed: September 8, 2005

Nos. 04-1465; 04-1474

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

STEPHANIE BRADLEY,          )
                                         )

Personal Representative of the       )
Estate of Clark Bradley,     Deceased,   )
                                         ) ON APPEAL FROM THE UNITED
        Plaintiff-Appellee,       ) STATES DISTRICT COURT FOR
                                         ) THE EASTERN DISTRICT OF
            v.              ) MICHIGAN
                                         )

CITY OF FERNDALE, et al.,      )
                                         )
        Defendants-Appellants,    )

BEFORE: DAUGHTREY and KEITH, Circuit Judges and WILLIAMS, Senior District Judge.[*]

**WILLIAMS, Senior District Judge.** Defendants-Appellants, City of Ferndale, Chief Kitchen, Officer Paul Simpson, Dispatcher Jason White, Cadet Wesley Crouse and Lieutenant Thomas J. Thomson appeal the district court's denial of their motions for summary judgment as to the plaintiff-appellee's federal and state claims. The district court held that summary judgment was inappropriate because the plaintiff had submitted sufficient evidence to create a genuine issue of material fact as to whether the defendants were deliberately indifferent to the decedent's serious medical needs. The district court further held that the plaintiff had submitted sufficient evidence to

_____

[*]The Hon. Glen M. Williams, Senior United States District Judge for the Western District of Virginia, sitting by designation.

-1-

create a genuine issue of fact as to whether the defendants' actions were the proximate cause of Bradley's death. For the reasons set forth below, we REVERSE the decision of the district court denying the defendants' motions for summary judgment.

## I. Background

On the night of January 22, 2000, the Ferndale Police Department was involved in a barricaded gunman situation at a Ferndale residence. (Joint Appendix, ("J.A"). at 336.) Due to the serious nature of the event, all available officers were committed to the scene. (J.A. at 336.) As a result of this commitment, Officer Paul Simpson, ("Simpson"), was the only officer available to patrol the city.[1] (J.A. at 336.) At approximately 7:53 p.m., Simpson responded to a suspicious persons report at 2047 Symes Street. (J.A. at 49.) As Simpson approached that address, he observed the decedent, Clark Bradley, ("Bradley"), wandering along the street with an open container of alcohol. (J.A. at 50.) Simpson pulled up along side of Bradley and began questioning him in order to determine whether he was the individual specified in the suspicious persons report. (J.A. at 49-50.) Simpson relayed Bradley's information to Dispatcher Jason White, ("White"), who entered it into the Law Enforcement Information Network Database. (J.A. at 50.) Upon entering his information into the system, the officers learned that Bradley was wanted on an outstanding bench warrant issued February 26, 1999, by the Oakland County Circuit Court. (J.A. at 50, 117.) Because the warrant was a "no-bond" warrant, Lieutenant Thomas J. Thomson, ("Thomson"), the officer in charge at the Ferndale Police Department, ordered Simpson to arrest Bradley and transport him to the station pending his transfer to the Oakland County Jail. (J.A. at 315-16.)

---

[1] On the night in question, Simpson was not scheduled to report for duty until 11:00 p.m. Due to a shortage in manpower, however, Simpson reported for duty five hours early at 6:00 p.m. (J.A. at 49.)

As Bradley was being processed at the Ferndale Police Station, he remarked to Simpson that Simpson should give him his gun so that he could shoot himself.[2] (J.A. at 51.) Although Simpson believed that Bradley had made the remark in jest, he reported it to Thomson, who had himself heard the remark. (J.A. at 51, 57, 334.) Thomson then asked Bradley if there was a problem, and Bradley responded sarcastically. (J.A. at 58.) White noted that Bradley smelled of alcohol and had trouble staying awake. (J.A. at 66.) During the booking process, the officers also learned that Bradley suffered from Hepatitis C. (J.A. at 57.) Based upon his medical condition and his remark to Simpson, Bradley's jail card was marked with a red sticker indicating the need to apply universal and suicide precautions during Bradley's detention. (J.A. at 52.)

At 8:35 p.m., Thompson notified the Oakland County Sheriff's Department that Bradley's pickup and transfer to the Oakland County Jail should be completed that night and could not be postponed until after the weekend as the County had requested. (J.A. at 123.) The request itself stated:

> Would normally not have a problem holding until Monday, but htis (sic) prisoner is intoxicated, has Hepatitis C, and is suicidal, and we are in the middle of a barricaded gunman. If possible, we would appreciate it if you would pick him up as soon as you can, as we are very short personnel due to the situation. Please advise us what you are going to do.

(J.A. at 123.) The County Sheriff's Department later responded that it would take possession of Bradley by midnight that night. (J.A. at 120, 125.)

At 8:40 p.m., Bradley was placed in a biohazard cell at the Ferndale Police Station. (J.A. at 118.) Bradley was the only detainee in the jail at that time. (J.A. at 118.) Following standard booking procedures, Simpson removed Bradley's belt, money, wallet and jacket. (J.A. at 203.) Bradley was allowed to keep his shirt and pants and Simpson gave him two blankets. (J.A. at 203,

_____

[2] Although the exact wording of Bradley's statement is not known, the parties generally agree that the statement involved Bradley either shooting himself or being shot by Simpson. (J.A. at 51, 57.)

210, 322.) After placing Bradley in his cell, Simpson went back out on patrol, and White set a timer so that he would be reminded to check on Bradley in one hour. (J.A. at 52, 227.) After Simpson had left, White and Thomson returned to the dispatchers desk to continue monitoring the barricaded gunman situation. (J.A. at 229.)

At some point after placing Bradley in his cell, Thomson looked at the monitors and saw Bradley lying on his bunk with the blankets. (J.A. at 317-18.) At 9:16 p.m., 36 minutes after Bradley was placed in his cell, White performed a cell check and found Bradley lying unconscious on the cell floor with a blanket tied around his neck. (J.A. at 118, 229-30.) White called to Thomson who entered the cell and began administering CPR. (J.A. at 67.) White instructed Crouse to call an ambulance and to notify Simpson that he was to return to the station immediately. (J.A. at 231.) Bradley was later pronounced dead from self-asphyxiation. (J.A. at 67.)

## II.   Procedural History

On July 19, 2002, Stephanie Bradley, ("plaintiff"), the personal representative of Bradley's estate, filed suit in the United States District Court for the Eastern District of Michigan against the defendants in both their individual and official capacities. (J.A. at 7.) The plaintiff alleged that the defendants acted with deliberate indifference to Bradley's known suicidal tendencies in violation of the Fourteenth Amendment. (J.A. at 13-16.) The plaintiff further alleged that the defendants' actions constituted gross negligence which was the proximate cause of Bradley's injuries. (J.A. at 11-12.) On June 3, 2003, the City of Ferndale, Chief Kitchen, Simpson, White and Crouse filed a Motion for Summary Judgment, asserting theories of qualified, absolute and governmental immunity. (J.A. at 19.) On June 5, 2003, Thomson, represented by separate counsel in this case, filed his own Motion for Summary Judgment based upon qualified and governmental immunity. (J.A. at 92.) On March 16, 2004, the district court granted the City of Ferndale's motion for summary judgment with regard to Bradley's state law gross negligence claims. (J.A. at 403.) The remaining defendants' motions for summary judgment were denied in their entirety. (J.A. at 396-405.) This appeal followed.

III. ANALYSIS

A. Plaintiff's § 1983 Claims

1. The Court's Jurisdiction

A district court's denial of qualified immunity is an appealable final decision under 28 U.S.C. § 1291, but only "to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). "[A] defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995). It is not fatal to the defendants' appeal that the district court based its holding on the existence of genuine issues of material fact, as "[t]his court has recognized the standard articulated by the Supreme Court: '*regardless of the district court's reasons* for denying qualified immunity, we may exercise jurisdiction over the ... appeal to the extent it raises questions of law.'" *Williams v. Mehra*, 186 F.3d 685, 689-90 (6th Cir. 1999) (en banc) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996)). Therefore, despite the label used by the district court, this court can consider whether "the undisputed facts or the evidence viewed in the light most favorable to the plaintiff fail to establish a *prima facie* violation of clear constitutional law." *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998).

Because this court does not have appellate jurisdiction over factual issues, a defendant must "concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Berryman*, 150 F.3d at 563. In compliance with this rule, the brief submitted by Simpson, White, Crouse and Chief Kitchen specifically noted that it is their position on appeal that "the facts as alleged by the Plaintiff are insufficient to establish deliberate indifference on the part of the Defendants." (Final Reply Brief Of Defendants/Appellants Chief Kitchen, Officer Paul Simpson, Dispatcher Jason White, And Cadet Crouse, ("Ferndale Defendants' Reply Brief") at 2.) Thus, the court may hear the Ferndale defendants' appeal.

With regard to the plaintiff's claims against Thomson, the court notes that Thomson continues to argue on appeal that Bradley's actions were not sufficient to put a reasonable person on notice that he was possibly suicidal. (Defendant-Apellant Thomson's Brief On Appeal, ("Thomson's Brief"), at 18.) The plaintiff argues that because Thomson failed to concede the facts as alleged by the plaintiff, this court is deprived of jurisdiction. (Plaintiff-Appellee's Final Consolidated Brief On Appeal, ("Appellee's Brief"), at 30.) This proposition is arguably supported by language in *Booher v. Northern Kentucky University Board of Regents*, 163 F.3d 395, 396-97 (6th Cir. 1999), and *Berryman v. Rieger*, 150 F.3d 561 (6th Cir. 1998). If, however, aside from the impermissible arguments regarding disputes of fact, the defendant also raises "the 'purely legal' question of 'whether the facts alleged ... support a claim of violation of clearly established law,'" *Berryman*, 150 F.3d at 562 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 528 n.9 (1985)), then there is an issue over which this court has jurisdiction. Therefore, this court can ignore Thomson's attempts to dispute the facts and, nonetheless, resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction. *See Phelps v. Coy*, 286 F.3d 295, 298-99 (6th Cir. 2002); *see also Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 602 n. 5 (6th Cir. 2005).

2. Individual Liability Under 42 U.S.C. § 1983

To state a claim under 42 U.S.C. § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). A government official performing discretionary functions is entitled to qualified immunity in his individual capacity if his conduct does not violate constitutional standards in light of clearly established law at the time of the alleged violation. *Barber v. City of Salem, Ohio*, 953 F.2d 232, 236 (6th Cir. 1992). "Qualified immunity is a government official's 'entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Such immunity is "'an expression of policy designed to aid in the effective functioning of government.'" *Scheuer v. Rhodes*, 416 U.S. 232, 242 (1974) (quoting *Barr v. Matteo*, 360 U.S. 564, 572-73 (1959)). Implicit in the qualified immunity doctrine is a recognition that police officers, acting reasonably, may err. *Scheuer*, 416 U.S. at 242.

In *Saucier*, the Supreme Court established a two-part test for determining whether qualified immunity applies. *Saucier*, 533 U.S. at 201. In the initial inquiry, the court must consider "this threshold question: [t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. If the facts, as alleged by the plaintiff, fail to establish a violation, then immunity applies. *Saucier*, 533 U.S. at 201. On the other hand, if the alleged facts sufficiently demonstrate a constitutional violation, we must determine "whether the right was clearly established." *Saucier*, 533 U.S. at 201. In making this determination, it is noted that the right claimed must be more than merely a generalized right; it must be clearly established in a particularized sense so that a reasonable official in the defendant's position knows that her actions violate that right. *Danese v. Asman*, 875 F.2d 1239, 1242 (6th Cir. 1989). Thus, we begin by identifying the contours of the substantive right allegedly violated. *County of Sacramento v. Lewis*, 523 U.S. 833, 842 n. 5 (1998).

When prison officials act with deliberate indifference to the serious medical needs of prisoners so that they inflict unnecessary pain or suffering, their actions violate the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). Pretrial detainees enjoy analogous protection under the Fourteenth Amendment's Due Process Clause. *Bell v. Wolfish*, 441 U.S. 520 (1979); *Horn*, 22 F.3d at 660.

Case law in this Circuit has established that psychological needs manifesting themselves in suicidal tendencies are serious medical needs for purposes of the due process analysis. *E.g.*, *Horn*, 22 F.3d at 660; *Barber v. City of Salem, Ohio*, 953 F.2d 232, 239-40 (6th Cir. 1992) (identifying the proper inquiry in suicide cases as "whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs"); *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988). Nonetheless, there is no general right of pretrial detainees to be correctly screened for suicidal tendencies. *Danese,* 875 F.2d at 1244. Nor has this court recognized a generalized right of a prisoner to be protected against committing suicide. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1096-97 (6th Cir. 1992). Against this background, the district court

correctly concluded that the right at issue here is the detainee's right to reasonable protection against taking his own life *if* that detainee has demonstrated a strong likelihood that he will commit suicide.

To establish a violation of this right, the plaintiff must show that the decedent demonstrated a strong likelihood of taking his own life and that the defendants acted with deliberate indifference to that threat. *Barber v. City of Salem, Ohio*, 953 F.2d 232, 239-40 (6th Cir. 1992). Because we construe the facts in the light most favorable to the nonmoving party for purposes of summary judgment, we assume, as the district court did, that a jury could reasonably find that Bradley's statements and behavior demonstrated a strong likelihood of suicide. At issue then is whether the plaintiff presented evidence from which a jury could reasonably find that defendants responded to this threat with deliberate indifference.

In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court explained the deliberate indifference standard in the context of an Eighth Amendment claim. The term describes a state of mind more blameworthy than negligence and requires more than an ordinary lack of due care, but can be satisfied with less than acts or omissions with knowledge that harm will result. *Farmer*, 511 U.S. at 835. In *Farmer*, the Court adopted a subjective standard for determining whether an official acted or failed to act with deliberate indifference: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. This standard requires conscious disregard for a substantial risk of serious harm. *Farmer*, 511 U.S. at 839; *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994). Accordingly, when an official fails to act in the face of an obvious risk of which she should have known but did not, the official has not inflicted punishment in violation of the Eighth Amendment. *See Farmer*, 511 U.S. at 837-38.

Whether the defendants acted with deliberate indifference to the serious medical needs of Bradley presents a mixed question of law and fact, which this court reviews *de novo*. *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999). Under the *Farmer* standard, in order for their conduct to constitute deliberate indifference, the defendants must have not only subjectively perceived the

facts from which they could draw an inference that their individual actions would increase the risk of Bradley's suicide, they must also have consciously disregarded that risk.

        3.      Applying the Standard to the Individual Defendants

As an initial matter, the court notes two points of contention with the district court's analysis. First, the district court based its denial of the defendants' motions for summary judgment almost entirely upon their alleged failure to follow Ferndale's internal procedures regarding the treatment of detainees exhibiting suicidal tendencies. (J.A. at 396-400.) For example, the district court notes that upon labeling Bradley as suicidal, the "[d]efendants did not encourage the prisoner to contact a friend or relative, they did not attempt to contact crisis intervention personnel; they did not remove the mattress, blanket, and other objects from the cell." (J.A. at 397.) The Supreme Court has held, however, that officials "do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer*, 468 U.S. 183, 194 (1984). Officials become liable for damages only to the extent that there is "a clear violation of the statutory rights that give rise to the cause of action for damages." *Davis*, 468 U.S. at 194 n.12. In *Smith v. Freland*, 954 F.2d at 343, 347 (6th Cir. 1992), this court held that under § 1983, "the issue is whether [the officer] violated the Constitution, not whether he should be disciplined by the local police force." *Smith*, 954 F.2d at 347; *See also Washington v. Starke*, 855 F.2d 346, 350 (6th Cir. 1988) (holding that a defendant's entitlement to qualified immunity would not be precluded where the "violation of the intra-departmental regulation would not have given rise to a cause of action for damages under either federal or Michigan law" at the time of violation). In the case at hand, the plaintiff has not shown that the specific violations alleged to have been committed by the defendants -- i.e. failing to provide for 15 minute checks on suicidal prisoners and failing to remove blankets from the cell of suicidal prisoners -- are specifically prohibited by either federal or Michigan law. As noted above, whether or not a defendant acted with deliberate indifference is dependent upon their subjective state of mind. *Farmer*, 511 U.S. at 839. Therefore, the district court erred when it based its denial of the defendant's motion for summary judgment solely upon the defendants' alleged failure to follow Ferndale's internal procedures. Instead, the court must ask whether the plaintiff has provided proof that the defendants subjectively perceived facts from which they could draw an

inference that their individual actions would increase the risk of Bradley's suicide, and that they ultimately acted in consciously disregard of that risk. *See Farmer*, 511 U.S. at 837-39.

Next, the court notes that the district court gave considerable weight to the plaintiff's expert's conclusory statements that the defendant's acted with deliberate indifference to Bradley's suicidal tendencies. For example, the district judge noted the expert's opinion that "[t]he egregious act alone of ignoring the policies because of a preoccupation with another is an act of deliberate indifference to Bradley's medical needs."(J.A. at 398.) As noted above, the violation of city policy is not in and of itself a constitutional violation under 42 U.S.C. § 1983. *Smith*, 954 F.2d at 347. Furthermore, as this court noted in *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994), "'deliberate indifference' is a legal term . . . . It is the responsibility of the court, not testifying witnesses, to define legal terms." *Berry*, 25 F.3d at 1353. Therefore, while the expert may give his opinion as to whether the defendant's actions complied with Ferndale's internal procedures, he may not testify that the violations of these policies proved that the defendants acted with deliberate indifference to Bradley's suicidal tendencies.[3] *See Berry*, 25 F.3d at 1353.

With the above concepts in mind, the court will assess the actions of each individual defendant in order to determine whether they subjectively perceived and disregarded a known risk that Bradley might harm himself.

---

[3] *Berry* involved another case where the expert made conclusory statements regarding whether the defendants acted with deliberate indifference. *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994). In *Berry*, the court noted that:

> "[A]n expert's opinion may "embrace[] an ultimate issue to be decided by the trier of fact[,]" Fed. R. Evid. 704(a), the issue embraced must be a factual one. The expert can testify, if a proper foundation is laid, that the discipline in the Detroit Police Department was lax. He also could testify regarding what he believed to be the consequences of lax discipline. He may not testify, however, that the lax discipline policies of the Detroit Police Department indicated that the city was deliberately indifferent to the welfare of its citizens.

*Berry*, 25 F.3d at 1353.

-10-

a.    Officer Simpson

Plaintiff contends that Simpson acted with deliberate indifference to Bradley's suicidal tendencies when he gave Bradley the blankets which Bradley later used to hang himself. (Appellee's Brief at 39.) The facts surrounding Simpson's involvement in this case reveal that upon hearing Bradley's statement about the gun, Simpson reported the remark to the shift commander in accordance with Ferndale's internal procedures. (J.A. at 51-52.) Although Simpson believed that Bradley had made the remark in jest, he reported it anyway just to be safe. (J.A. at 51.) This led to Bradley being flagged a possible suicide risk. (J.A. at 52.) In accordance with procedure, Simpson removed Bradley's belt, jacket and other personal belongings before giving him two blankets and placing him in his cell. (J.A. at 203.) After placing Bradley in his cell, Simpson went back out on patrol. (J.A. at 52.)

The above facts do not evidence a conscious disregard for Bradley's safety. Upon hearing Bradley's statement, Simpson reported it to his shift commander in accordance with Ferndale's procedure. (J.A. at 51.) While it is true that Simpson gave Bradley the blankets, there is no evidence that he did so knowing that Bradley might attempt to hang himself. In fact, Simpson testified that prior to Bradley's death, he had received no training on how to deal with suicidal prisoners at all. (J.A. at 194.) Finally, the decision to remove the blankets was a decision to be made by the officer in charge, not Simpson. (J.A. at 287-88.) The option for removing blankets from the cells of detainees suspected of harboring suicidal tendencies is found under Section II(B)(4)(g) of Article 7 of Ferndale's Policies and Procedures. (J.A. at 288.) Section II (B)(4) of Article 7 provides that "the duty command officer *may* exercise one of the following alternatives" if his preliminary evaluation indicates a potential suicide. (J.A. at 287.) At no point does the plaintiff argue that Thomson ordered Simpson to remove the blankets from Bradley's cell. Even if the court were to find that Simpson should have known of the risk presented when giving Bradley the blanket, when an official fails to act in the face of an obvious risk of which she should have known but did not, the official has not inflicted punishment in violation of the Eighth Amendment. *See Farmer*, 511 U.S. at 837-38. Therefore, the district court erred when it denied Simpson's motion for summary judgment on qualified immunity grounds.

b.      Dispatcher White

Plaintiff contends that White exhibited deliberate indifference to Bradley's suicidal tendencies because he left Bradley unsupervised in his cell for 36 minutes while he was busy tending to the barricaded gunman situation. (Appellee's Brief at 39-40.)   White's  responsibilities as dispatcher required him to monitor the radio and phones and to make regular checks of the detainees held in the station's lockup. (J.A. at 221-22.)  White testified that he spent 65 to 75 percent of his time monitoring the radio and phones. (J.A. at 222.)  To support this role, six CCTV monitors were located above the dispatcher's desk which allowed the dispatcher to view the interior of each cell. (J.A. at 222.)  White testified that  he flagged Bradley as being a suicide risk upon hearing his remark. (J.A. at 66.)  After Bradley was placed in his cell, White set a timer to remind himself to check on Bradley in one hour. (J.A. at 227.)  Upon doing so, White returned to his desk and resumed monitoring the barricaded gunman situation. (J.A. at 229.)  At 9:16, 36 minutes after Bradley was placed in his cell, White decided to check on Bradley, at which time he found Bradley lying unconscious on the floor with a blanket tied around his neck. (J.A. at 230.)  White noted in his supplemental report that he went to check on Bradley before the hour was up because he was concerned with Bradley's peculiar behavior. (J.A. at 67.)  Upon finding Bradley, White called to Thomson, who entered the cell and began to administer CPR. (J.A. at 66-67.)

Again, White's actions, as alleged by the plaintiff, do not support a finding that White acted with conscious disregard of Bradley's suicidal tendencies.  The option of providing for 15 minute checks of detainees suspected of harboring suicidal tendencies is found under Section II(B)(4)(f) of Article 7 of Ferndale's Policies and Procedures. (J.A. at 288.)  Section II (B)(4) of Article 7 provides that "the duty command officer *may* exercise one of the following alternatives" if his preliminary evaluation indicates a potential suicide. (J.A. at 287.)  Thus, the decision to check on prisoners every 15 minutes was left up to the duty command officer and not the dispatcher, and at no time does the plaintiff allege that White received such an order.  Following standard procedure, White set a timer to remind himself to check on Bradley in one hour.  (J.A. at 227.)  Nonetheless, White decided to check on Bradley 24 minutes early because he was concerned with Bradley's peculiar behavior. (J.A. at 67.) White testified that he received no training regarding Ferndale's policies on interacting

with suicidal prisoners. (J.A. at 234.) The plaintiff has provided no evidence suggesting that White believed that Bradley might commit suicide if not checked on earlier. Therefore, the district court should have granted White's motion for summary judgment.

c.       Cadet Crouse

The plaintiff next argues that Crouse acted with deliberate indifference to Bradley's suicidal tendencies because he failed to make 15 minute checks on Bradley as is provided for in Ferndale's Policies and Procedures. (Appellee's Brief at 39.) Here, the evidence shows that Crouse was hired as a police intern on October 15, 1999. (J.A. at 245-246.) Crouse testified that his duties as an intern required him to assist the dispatcher and desk officer in the dispatch center. (J.A. at 245.) Crouse testified that this usually entailed answering telephones, dispatching units to police calls and booking and checking on prisoners. (J.A. at 246.) Crouse noted that he also washed the police cars and picked up the prisoners' meals. (J.A. at 248.) Finally, Crouse noted that, as an intern, he was not to perform a job unless he was specifically instructed to do so. (J.A. at 246.)

On the night of Bradley's suicide, Crouse had been instructed to try and contact the barricaded gunman by telephone.[4] (J.A. at 250-51.) Crouse noted that this was a continuing process as he would let the phone ring until the answering machine picked up, at which time he would hang up and call again. (J.A. at 250-51.) Crouse testified that he was not involved in booking Bradley and that he didn't remember anything from the time Bradley was booked until White checked his cell 36 minutes later. (J.A. at 250, 252.) As Crouse noted in his deposition, he was only responsible for checking on prisoners when he was specifically ordered to do so. (J.A. at 246.) At no point does the plaintiff suggest that Thomson ordered Crouse to cease his attempts to contact the barricaded gunman and check on Bradley. Because the plaintiff has failed to produce any evidence suggesting that Crouse was responsible for checking on Bradley, it cannot be said that his failure to do so

---

[4] Captain Collins's deposition further supports Crouse's testimony that he had been assigned to try and make contact with the barricaded gunman on the night of Bradley's suicide. (J.A. at 344.)

constituted a conscious disregard of Bradley's suicidal tendencies. Therefore, the court finds that the district court erred in failing to grant Crouse's motion for summary judgment.

d.        Lieutenant Thomson

The plaintiff contends that Thomson acted with deliberate indifference to Bradley's suicidal tendencies because he did not see to it that Ferndale's policies were implemented. (Appellee's Brief at 42.)  Specifically, the district court held that Thomson's failure to remove the blankets from Bradley's cell and establish 15 minute checks once he suspected that Bradley was suicidal created a genuine issue of material fact as to whether Thomson acted with deliberate indifference. (J.A. at 399-400.)

The record indicates that upon hearing Bradley's remark, Bradley was labeled as a suicide risk and Thomson made provisions to expedite Bradley's transfer to the County Jail. (J.A. at 57.) When the Oakland County Sheriff's Department requested that Bradley's transfer be postponed until the following Monday, Thomson responded that the transfer would have to be completed that night. (J.A. at 123.)  The request itself stated:

> Would normally not have a problem holding until Monday, but htis (sic) prisoner is intoxicated, has Hepatitis C, and is suicidal, and we are in the middle of a barricaded gunman. If possible, we would appreciate it if you would pick him up as soon as you can, as we are very short personnel due to the situation. Please advise us what you are going to do. (J.A. at 123.)

At some point after placing Bradley in his cell, Thomson looked at the monitors and saw Bradley lying on his bunk with the blankets. (J.A. at 317-18.)  Finally, after Thomson learned that Bradley had attempted suicide, he entered Bradley's cell and, despite knowing that Bradley had Hepatitis C, he began to administer CPR. (J.A. at 67.)

Again, Thomson's actions do not evidence a conscious disregard of Bradley's suicidal tendencies. Thomson recognized Bradley's condition and made provisions to have him transferred to a facility which was better equipped to provide for his needs. (J.A. at 57.)  While removing the

blankets and imposing 15 minute checks on Bradley's cell may have succeeded in preventing Bradley from committing suicide, Article 7 of Ferndale's Policies and Procedures does not specifically require these acts. (J.A. at 287-88.) Section II (B)(4) of Article 7 provides that "the duty command officer *may* exercise one of the following alternatives" if his preliminary evaluation indicates a potential suicide. (J.A. at 287-88.) As noted above, when an official fails to act in the face of an obvious risk of which she should have known but did not, the official has not inflicted punishment in violation of the Eighth Amendment. *See Farmer*, 511 U.S. at 837-38. Therefore, the district court erred in denying Thomson's motion for summary judgment.

Finally, because the plaintiff has not established that the above defendants violated Bradley's constitutional rights, there is no need to determine whether the right violated was clearly established.

e.      Chief Kitchen

The district court denied Chief Kitchen's motion for summary judgment based on qualified immunity without prejudice because he had not been deposed at that time. (J.A. at 402.) The defendants have not opposed this ruling on appeal. Therefore, whether Chief Kitchen is entitled to qualified immunity is an issue best left for the district court.

B.      Plaintiff's State Law Claims Alleging Gross Negligence

1.      The Court's Jurisdiction Over Defendants' Appeals

In *Walton v. City of Southfield*, 995 F.2d 1331, 1342 -1344 (6th Cir. 1993), this court held that a defendant could not appeal a district court's denial of governmental immunity pursuant to Michigan Compiled Laws § 691.1407 because it was not a "final decision" under 28 U.S.C. § 1291. *Walton*, 995 F.2d at 1344. In its ruling, the court noted that § 691.1407 provided governmental immunity from liability only, not from suit. *Walton*, 995 F.2d at 1344. In a diversity case or a federal question action involving pendent state claims, *Mitchell v. Forsyth*, 472 U.S. 511 (1985), and *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), dictate that the court must look to state

-15-

immunity law to determine if a denial of immunity based on state law is appealable. *Walton*, 995 F.2d at 1343. In looking to Michigan law, the court noted that § 691.1407 codified the judicially created governmental immunity doctrine established in *Ross v. Consumers Power Co.*, 363 N.W.2d 641 (Mich. 1984). In *Reardon v. Department of Mental Health*, 424 N.W.2d 248, 254 (1988), the Michigan Court of Appeals noted that the statute "codified the *Ross* definition practically verbatim," except for abolishing Ross's ministerial versus discretionary test for individual immunity. In *Marrical v. Detroit News, Inc.*, 805 F.2d 169, 172 (6th Cir. 1986), this court noted that:

> Since we find no indication that Michigan's doctrine of absolute or qualified immunity includes a right to be free from the exigencies of trial, we conclude that Michigan law affords no basis for imposing on litigants the burdens of an interlocutory appeal.

The court's decision turned on the fact that the language in *Ross* referred to immunity from liability, and "nowhere included among its reasons for immunizing governmental officials the need to protect against the disruptions of pre-trial proceedings such as discovery or the burdens of trial other than the risk of ultimate liability in damages." *Marrical*, 805 F.2d at 173-74. Indeed, the text of § 691.1407 itself mentions immunity from liability only, not from suit.[5] Mich. Comp. Laws § 691.1407. As the defendants note, however, the June 4, 2002, amendment to Michigan Court Rule 7.202(7)(a)(v) included as a "final order," for purposes of appeal, "[a]n order denying governmental immunity to a governmental party, including a governmental agency, official, or employee." Therefore, as the denial of governmental immunity is now a "final order" providing defendants with an appeal of right to the Michigan Court of Appeals, the issue is properly before the court on interlocutory appeal.

---

[5] Mich. Comp. Laws § 691.1407(2) states, in pertinent part:

Each ... employee of a governmental agency ... shall be immune from tort liability for injuries to persons or damages to property caused by the ... employee ... while in the course of employment ... while acting on behalf of a governmental agency if all of the following are met:

2.      The Individual Defendants' Entitlement to Governmental Immunity

The court will review a grant or denial of summary judgment *de novo*, using the same Rule 56(c) standard as the district court. *Cox v. Kentucky Department of Transportation*, 53 F.3d 146, 149 (6th Cir.1995) (citing *Hansard v. Barrett*, 980 F.2d 1059 (6th Cir.1992)).  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In deciding a motion for summary judgment, we view the factual evidence and draw all reasonable inferences in favor of the non-moving party.  *National Enterprises v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997).  To prevail, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Klepper*, 916 F.2d at 341-42 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The tort liability of governmental employees under Michigan law is governed by the employee provision of the governmental immunity act, which states in pertinent part:

> Each ... employee of a governmental agency ... shall be immune from tort liability for injuries to persons or damages to property caused by the ... employee ... while in the course of employment ... while acting on behalf of a governmental agency if all of the following are met:
> (a) The ... employee ... is acting or reasonably believes he or she is acting within the scope of his or her authority.
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
> (c) The ... employee's ... conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

Mich. Comp. Laws § 691.1407(2). The district court held that "the proximate cause issue is for the jury to decide and Plaintiff has submitted sufficient evidence to create a genuine issue of fact as to whether their action or inaction was grossly negligent under the circumstances." (J.A. at 404.) There is no question that (a) and (b) are satisfied in the case at hand. The question is, therefore, whether the defendants' conduct amounted to gross negligence that was the proximate cause of Bradley's death.

In *Robinson v. City of Detroit*, 613 N.W.2d 307, 317 (Mich. 2000), the Michigan Supreme Court overruled *Dedes v. Asch*, 521 N.W.2d 488 (Mich. 1994), "to the extent that it interpreted the phrase 'the proximate cause' in subdivision (c) to mean 'a proximate cause.'" The *Robinson* Court reasoned that "[t]he Legislature's use of the definite article 'the' clearly evinces an intent to focus on one cause." *Robinson*, 613 N.W.2d at 317. The court ultimately held that "[t]he phrase 'the proximate cause' is best understood as meaning the one most immediate, efficient, and direct cause preceding an injury." *Robinson*, 613 N.W.2d at 317.

In *Kruger v. White Lake Twp.*, 648 N.W.2d 660 (Mich. Ct. App. 2002), the Michigan Court of Appeals applied *Robinson* to a case involving the death of pretrial detainee. In *Kruger*, the decedent's mother called the White Lake Township Police Department and requested that her daughter, Katherine Kruger, ("Kruger"), be taken into custody. *Kruger*, 648 N.W.2d at 661. Kruger's mother informed the police that Kruger was intoxicated and that she feared that Kruger posed a danger to herself and others. *Kruger*, 648 N.W.2d at 661. Upon arresting Kruger, the officers learned that she had an outstanding warrant issued against her in the Bloomfield Township. *Kruger*, 648 N.W.2d at 661. After Kruger was arrested, the officers transported her to the White Lake Township Police Department to await her transfer to Bloomfield Township. *Kruger*, 648 N.W.2d at 661. Due to a lack of vacant holding cells, Kruger was handcuffed to a ballet bar in the station's booking room. *Kruger*, 648 N.W.2d at 661-62. The officers left Kruger in the booking room unattended, where she was later able to free herself from the handcuffs and escape. *Kruger*, 648 N.W.2d at 662. As she fled from the police station, Kruger ran into traffic and was struck and killed by an unidentified vehicle. *Kruger*, 648 N.W.2d at 662.

Kruger's representative subsequently filed suit alleging gross negligence on the part of the Township and its officers. *Kruger*, 648 N.W.2d at 662. The trial court dismissed Kruger's claim and Kruger appealed. *Kruger*, 648 N.W.2d at 661. Citing the court's holding in *Robinson*, the Michigan Court of Appeals held that, even assuming that the defendants' conduct was grossly negligent, it was not the direct cause of Kruger's death. *Kruger*, 648 N.W.2d at 663. The court noted that the more direct causes of Kruger's death was her escaping from the police station, her running into traffic and her being hit by the car. *Kruger*, 648 N.W.2d at 663.

In an unpublished opinion by the Michigan Court of Appeals, *Scott v. Charter Twp. of Cinton*, No. 233266, 2002 WL 31160298 (Mich. App. Sept. 27, 2002), the court applied the *Robinson* court's analysis to claims against police officials for failing to prevent an inmate's suicide. In *Scott*, the decedent hung himself with the drawstring of his pants after being arrested for a domestic dispute. *Scott*, 2002 WL 31160298, at *1. Following Scott's suicide, the plaintiff filed suit against the Township, its police department and several individual officers. *Scott*, 2002 WL 31160298, at *1. The district court granted summary judgment for the defendants and plaintiff appealed. *Scott*, 2002 WL 31160298, at *1. On appeal, the plaintiff argued that the trial court erred because it had set forth sufficient facts to show that the officers were grossly negligent for refusing to obtain medical treatment for Scott, for disobeying department policies on how to treat suicidal inmates and for failing to find and remove the drawstring on Scott's pants. *Scott*, 2002 WL 31160298, at *2-3. Applying the *Robinson* analysis, the court concluded that the one most immediate, efficient, and direct cause preceding his injury was Scott's act of hanging himself. *Scott*, 2002 WL 31160298, at *3.

Next, in *Soles v. Ingham County*, 316 F.Supp.2d 536 (W.D. Mich. 2004), the personal representative of the deceased inmate filed a complaint alleging that the inmate's suicide was caused by the prison officials' deliberate indifference, gross negligence and negligence. In *Soles*, the decedent, Frayer, was placed in an observation cell because he was known to be suicidal. *Soles*, 316 F. Supp. 2d at 539. Frayer was later returned to the general population after promising a social worker that he would not harm himself. *Soles*, 316 F. Supp. 2d at 540. On the evening of Frayer's suicide, one of the guards noticed that Frayer was acting strange and stated that he had a "gut hunch"

-19-

that the Frayer might try to commit suicide at some point during the night. *Soles*, 316 F. Supp. 2d at 540. The guard did not request that Frayer be returned to an observation cell, and he failed to inform his replacement of his suspicions. *Soles*, 316 F. Supp. 2d at 540. Frayer successfully committed suicide later that night. *Soles*, 316 F. Supp. 2d at 540. After his death, Frayer's personal representatives filed suit against the guard and social worker alleging that their actions constituted gross negligence. *Soles*, 316 F. Supp. 2d at 540-41. In granting the defendants' motion for summary judgment, the district court concluded that even if the defendants were deemed responsible for some nonfeasance amounting to gross negligence, liability could be imposed only if such nonfeasance was the proximate cause of Frayer's death. *Soles*, 316 F. Supp. 2d at 546. The court went on to note that it was "undisputed that [Frayer] committed suicide while he was alone in his cell by hanging himself with a bed sheet." *Soles*, 316 F. Supp. 2d at 546. The one most immediate, efficient and direct cause of his death was clearly not any nonfeasance by the defendants, but [Frayer's] own volitional self-destructive act." *Soles*, 316 F. Supp. 2d at 546. When viewed in light of these decisions, it is clear that the one most immediate, efficient and direct cause of Bradley's death was his own act of hanging himself.

Finally, the plaintiffs expert placed the ultimate blame not with the individual officers, but with the City's failure to adequately train its employees. (J.A. at 173-74.) As noted above, the expert concluded that:

> Thomson indeed shoulders some blame for Bradley's death. But Thomson was not prepared to handle a suicide risk. That blame rests with the city and the police department. The provision of "hollow" policies without explanation or training to all of the members responsible for prisoners is the overriding reason and moving force behind the deficiencies that allowed Bradley, a known and flagged suicide risk, to complete the act while a TV monitor displayed his actions to otherwise engaged, indifference and untrained employees.

(J.A. at 173-74.) Therefore, as the actions of the individual defendants were not the one most immediate, efficient and direct cause of Bradley's death, the district court erred when it denied defendants Simpson, White, Crouse, Thomson and Chief Kitchen's motions for summary judgment on plaintiff's state law claims.

IV. Conclusion

For the reasons stated above, defendants Simpson, White, Crouse and Thomson are entitled to qualified immunity, and the district court's denial of these defendants' motions for summary judgment on Bradley's 1983 claim is REVERSED and judgment is entered in their favor on those claims. In addition, defendants Simpson, White, Crouse, Thomson and Chief Kitchen are entitled to governmental immunity pursuant to Michigan Compiled Laws § 691.1407(2). Accordingly, the district court's denial of the defendants' motion for summary judgment on Bradley's state law claims is REVERSED and judgment is entered in their favor on those claims. The remaining § 1983 claim against Chief Kitchen, on which the parties did not appeal the denial of summary judgment, is remanded to the district court.

DAMON J. KEITH, Circuit Judge, concurring in part, dissenting in part.

I concur in the majority's disposition of the claims Bradley has alleged against Dispatcher White, Cadet Crouse, and Chief Kitchen. I, however, am compelled to depart from the majority with regard to Bradley's claims against Officer Simpson and Lieutenant Thomson for acts of deliberate indifference and gross negligence.

## I. Deliberate Indifference

A plain application of the deliberate indifference standards in this circuit and by the Supreme Court affirms that Bradley has stated viable claims of deliberate indifference against Officer Simpson and Lieutenant Thomson. As the majority has acknowledged, Majority Op. at 11, the Supreme Court set forth the standard for evaluating claims of deliberate indifference in *Farmer v. Brennan*, 511 U.S. 825, 837 (1994):

> We hold . . . that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

This circuit has repeatedly taken a two-step approach in applying the standard of *Farmer*: we have required that claims of deliberate indifference satisfy (1) an objective component, and (2) a subjective component. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005) ("There are two parts to the claim, one objective, one subjective."); *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) ("A claim for the deprivation of adequate medical care 'has two components, one objective and one subjective.'")(internal citation omitted); *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) (same); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (same). Under the objective component, we require a claimant to establish the "existence of a 'sufficiently serious' medical need." *Estate of Carter*, 408 F.3d at 311; *Blackmore*, 390 F.3d at 895 (quoting *Farmer*, 511 U.S. at 834); *Comstock*, 273 F.3d at 703. Under the subjective component, the claimant must show that the defendant possessed "a sufficiently culpable state of mind," *Estate*

-22-

*of Carter*, 408 F.3d at 311, such that the defendant knew of but nonetheless disregarded the claimant's serious risk of harm.

In the instant case, the majority concedes, and I agree, that suicidal tendencies constitute a medical need that is sufficiently serious to satisfy the objective component of the deliberate indifference standard. Majority Op. at 9. *See also Comstock*, 273 F.3d at 703 ("We have held that a prisoner's 'psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies.'") (quoting *Horn v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)).

Having satisfied the objective component, Bradley's claim must also satisfy the subjective component. Inasmuch as I believe that the evidence, viewed in the light most favorable to Bradley, permits a jury to reasonably conclude that Officer Simpson and Lieutenant Thomson both perceived that Bradley posed a serious risk of harm to himself and that they disregarded that risk, I would hold that Bradley has stated a viable claim of deliberate indifference against those two officials. To meet the subjective component, the evidence must permit a reasonable jury to find that Officer Simpson and Lieutenant Thomson each possessed a "sufficiently culpable state of mind." *Estate of Carter*, 408 F.3d at 312. To do that, Bradley must show that "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregard that risk." *Comstock*, 273 F.3d at 703 (citing *Farmer*, 511 U.S. at 837). "Deliberate indifference 'entails something more than mere negligence,' but can be 'satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Blackmore*, 390 F.3d at 895-96 (quoting *Farmer*, 511 U.S. at 835).

In the present case, the evidence established that Officer Simpson and Lieutenant Thomson both witnessed Bradley state that he wanted either to shoot himself or to be shot by a police officer. After hearing the statement, Officer Simpson demonstrated sufficient concern for Bradley's mental state and reported it to Lieutenant Thomson, who had in fact heard the statement himself. Out of concern that Bradley was likely suicidal, Lieutenant Thomson directed that Bradley's prisoner intake file be flagged with a red sticker to indicate he was likely suicidal. Officer Simpson was present at the time and knew that Bradley had been red-flagged as suicidal. In my view, this set of facts,

viewed in the light most favorable to Bradley, sufficiently demonstrates that Officer Simpson and Lieutenant Thomson both perceived that Bradley posed a serious risk of harm to himself.[1]

The evidence, I believe, equally establishes that Officer Simpson and Lieutenant Thomson disregarded that risk. A jury could reasonably conclude that despite having knowledge of the serious risk that Bradley posed to himself, Officer Simpson recklessly disregarded that risk when he gave Bradley two blankets. The majority errs by concluding that "[w]hile it is true that Simpson gave Bradley the blankets, there is *no evidence* that he did so knowing that Bradley might attempt to hang himself," Majority Op. at 14 (emphasis added), and that "[e]ven if the court were to find that Simpson should have known of the risk presented when giving Bradley the blanket, when an official fails to act in the face of an obvious risk of which she should have known but did not, the official has not inflicted punishment in violation of the Eighth Amendment," *Id*. at 15. These conclusions are in error for two reasons. First, as discussed above, there is evidence that Officer Simpson personally perceived the risk that Bradley "might attempt" to commit suicide. Officer Simpson heard Bradley make a statement evincing suicidal tendencies, and he considered the statement sufficiently significant that he reported it to Lieutenant Thomson. Officer Simpson also knew that Lieutenant Thompson had decided that Bradley's prisoner intake file should be flagged with a red sticker indicating he was suicidal. Both of these events occurred in Officer Simpson's presence before he gave Bradley two blankets. Thus, there is evidence that Officer Simpson knew Bradley might attempt to harm himself when he gave him the blankets.

Moreover, the majority's holding implies that the standard for a deliberate indifference claim requires Officer Simpson to have known that Bradley would harm himself. That is not the rule. Bradley must show only that Officer Simpson perceived *the risk* and disregarded that risk.

---

[1]Based on Officer Simpson's deposition testimony, the majority asserts that "[a]lthough Simpson believed that Bradley had made the remark [about shooting himself] in jest, he reported it anyway just to be safe." Majority Op. at 14. Officer Simpson's after-the-fact attempt to discount Bradley's suicidal statement does not square with his actions at the time that the statement was made. At that earlier time, he thought the remark was serious enough that he should report it to his command officer. Moreover, Officer Simpson's belated assessment in this regard merely creates a genuine issue of material fact concerning what he actually perceived, and the majority's reliance on it does not view the evidence in the light most favorable to Bradley.

Knowledge that harm would result is not required. "[A] plaintiff need not show that the official acted 'for the very purpose of causing harm or with knowledge that harm will result.' . . . Instead, 'deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of *recklessly* disregarding that risk.'" *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 835-36) (emphasis added) (internal citation omitted). Viewed in the light most favorable to the non-moving party, the record evidence in this case demonstrates that Officer Simpson recognized the risk and subsequently disregarded it.

Turning to Lieutenant Thomson, the evidence demonstrates that he heard Bradley's suicidal statement, instructed the dispatcher to place a red sticker on Bradley's prisoner intake file, and at some point thereafter saw Bradley in his cell with the blankets. The majority shields Lieutenant Thomson of any liability because he "made provisions to have [Bradley] transferred to a facility which was better equipped to provide for his needs." Majority Op. at 19. In my view, arranging Bradley's transfer does not absolve Lieutenant Thomson of his obligation to provide for Bradley's medical needs while Bradley remained under his care. As the majority makes clear, Lieutenant Thomson, as the on duty command officer, had a multitude of options at his disposal for dealing with suicidal detainees. *See* Majority Op. at 15, 16, and 19. Yet, after recognizing the risk that Bradley posed to himself, Lieutenant Thomson did nothing.

For the above reasons, I would affirm the district court's denial of summary judgment with regard to Officer Simpson and Lieutenant Thomson.

## II. Gross Negligence

Inasmuch as I conclude that a genuine issue of material fact exists as to whether (1) Officer Simpson acted with gross negligence in giving blankets to a detainee who he knew presented a suicidal risk, and (2) Lieutenant Thomson acted with gross negligence because after designating the detainee as suicidal he observed him with blankets but did not monitor him or remove the blankets, I would affirm the decision of the district court. Police officers take prisoners as they find them. Here, Bradley was suicidal. The evidence indicates that the officers knew he was suicidal. Despite this knowledge, Officer Simpson gave him two blankets and Lieutenant Thomson observed him with the blankets but did not remove the blankets or closely monitor Bradley. The police officials did

-25-

not merely fail to act; rather, their joint actions worsened Bradley's fate. Under these circumstances, I would hold that a jury could reasonably conclude that Officer Simpson and Lieutenant Thomson were "the one most immediate, efficient, and direct cause preceding" Bradley's death. *Robinson v. City of Detroit*, 613 N.W.2d 307, 317 (Mich. 2000).

None of the cases cited by the majority support its conclusion that Officer Simpson and Lieutenant Thomson cannot be liable for gross negligence resulting in the death of Bradley. This case is not at all like *Kruger v. White Lake Twp.*, 648 N.W.2d 660, 662 (Mich. Ct. App. 2002), in which the plaintiff was left alone in the booking room "and was eventually able to maneuver her way out of the handcuffs and escape. As she fled from the police station, she ran into traffic and was hit by an unidentified vehicle." The present case is equally distinguishable from *Scott v. Charter Twp. of Clinton*, No. 233266, 2002 WL 31160298 (Mich. Ct. App. Sept. 27, 2002). In that unpublished case, police officers had arrested Scott during a domestic dispute and "Scott committed suicide by hanging himself with the drawstring from his pants." *Id*. Unlike in the present case, *Scott* did not involve the presence of any evidence showing that the officers had determined or even suspected the detainee was suicidal. In addition, Scott killed himself using a drawstring from his own clothing, and not using articles which had been provided by the police.

The majority's reliance on *Soles v. Ingham County*, 316 F. Supp. 2d 536 (W.D. Mich. 2004) is similarly misplaced. In *Soles*, the detainee committed suicide in his cell by hanging himself with his bed sheet. *Id*. at 540. The prison officials in *Soles*, however, had moved the detainee to an observation cell after he reported having suicidal thoughts to a corrections officer, arranged for his immediate evaluation by a mental health worker, transferred him to the psychiatric unit of St. Lawrence Hospital, and returned him to an observation cell upon his release from the hospital psychiatric unit. *Id*. at 539-40. In addition, the detainee underwent multiple therapy sessions with the prison mental health worker and "signed a 'no-harm contract,' agreeing not to harm himself or others and to notify a deputy if he felt he was going to harm himself or others," *Id*. at 540, all prior to being returned to the general population where he hanged himself. Hence, I am not persuaded that the district court's holding in *Soles* has any applicability to the case pending before this court.

The majority holds that "it is clear that the one most immediate, efficient and direct cause of Bradley's death was his own act of hanging himself." Majority Op. at 26-27. If the majority is right, under Michigan law a detainee's suicide can never result from the gross negligence of police officers because, by definition, every successful suicidal detainee will have died from self-inflicted acts. I, however, have found no case law holding that a detainee's suicide can never result from the gross negligence of police officers. If this were so, it would make no difference whether the officers had supplied this known suicidal detainee with blankets, as they did, or with a noosed rope. After determining Bradley was suicidal, Officer Simpson gave him—and Lieutenant Thomson let him keep—blankets that he used to commit suicide. Under these circumstances, I believe a jury could reasonably conclude that these officers constituted the single most immediate, efficient and direct cause of Bradley's death.

Thus, I respectfully dissent.